**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CR 509 SNLJ / DDN |
| | ) | |
| AARON GILMORE, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND RECOMMENDATION

On March 2, 2016, this action came before the court for an evidentiary hearing on the pretrial motions of the parties, which were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b). Pending are the motions of defendant Aaron Gilmore to suppress evidence and statements (Docs. 11 oral, 39) and to dismiss forfeiture seizure warrants (Doc. 42); and of the government for a determination by the court of the admissibility of any arguably suppressible evidence (Docs. 12 oral, 18).

From the evidence adduced during the evidentiary suppression hearing, and considering the memoranda of the parties, the undersigned makes the following findings of fact and conclusions of law:

## FACTS

1. During May 2015 Police Detective Timothy Livingstone was a member of a St. Ann, Missouri, police undercover drug investigation unit. During that month, he and other members of the unit, including Dets. William Griffin, Jeff Seery, and Ron Martin were investigating drug dealing in the St. Ann area. On May 29, 2015, around 2:20 p.m., the unit received information from a confidential informant (CI) that CI had just bought a quantity of crystal methamphetamine from RL. Shortly thereafter, Det. Livingstone arrested RL and his wife, DL, and recovered a quantity of methamphetamine from them. In a post-arrest interview, RL stated that his source for the methamphetamine

was a person named Aaron Gilmore who resided at 9434 Marlowe in Overland, Missouri, a municipality near St. Ann. That was the first time Det. Livingstone had heard of Aaron Gilmore. Further investigation indicated that Aaron Gilmore's source for crystal methamphetamine was Cameron Moore whom Det. Livingstone had under investigation. RL told Livingstone that Aaron Gilmore lived in the Marlowe residence with his father John Gilmore, his girlfriend, and her child. The earlier investigation of Moore had not indicated any involvement of Aaron Gilmore. A record check of Aaron Gilmore then indicated that he had previously been convicted of a felony offense in the Missouri state courts.

2.      Thereafter, at approximately 4:00 p.m. on May 29, 2015, in an unmarked police vehicle, Dets. Livingstone and Griffin, in an undercover capacity, drove to a location approximately 100 yards of Aaron Gilmore's residence at 9434 Marlowe. From this location they saw John Gilmore, Aaron's father, leave the residence and drive away by himself in his distinctive vehicle, a combination of an S-10 truck with a Corvette rear end. They followed the truck to a location on Roseland, about three miles from 9434 Marlowe. At that location on Roseland, using a distinctive "chirp" sound from their air horn, without flashing their police emergency lights and without using the siren, the officers stopped the truck. They exited their police vehicle and walked up to the truck, Det. Livingstone toward the driver's side window and Det. Griffin, within earshot of Det. Livingstone, at the right rear of the truck for security. Both officers were in plain clothes; they were armed, but neither had drawn his weapon. Only John Gilmore was in the truck. The purpose of the stop was to explain to him what they knew about the drug dealing occurring in the Marlowe residence. John got out of his truck and spoke with Livingstone alongside the truck.

3.      Det. Livingstone identified himself to Gilmore as a St. Ann narcotics officer. John Gilmore, who appeared to be in his mid-60's, told Livingstone he was hard of hearing. In a louder than normal voice, Livingstone described to John Gilmore the drug investigation that involved his residence on Marlowe. Gilmore said that he knew about his son's drug trafficking at his residence, that his son and his son's girlfriend were

constantly fighting, that he had called the St. Ann police to get his son out of the residence, but that he was having trouble evicting his son, his son's girlfriend, and their little boy. John Gilmore said he was tired of the drug activity there. Without coercion or force, he told the officer that he would help them. Mr. Gilmore appeared to be relieved. John Gilmore was very cooperative and friendly with the officers. He even explained to Det. Livingstone how he built his truck. When asked if he would consent to the officers searching his residence, he answered in the affirmative. He told the officers that he owned 9434 Marlowe. The officers did not threaten John Gilmore, make any promise to him, or tell him he had to consent.

4.    Det. Livingstone then handed John Gilmore a Consent to Search Property form, Government Exhibit 1. The form had been partially filled in by Det. Livingstone. It stated: "I, John Gilmore, voluntarily consent and agree that an officer or officers of the St. Ann Police Department may search: Premises occupied by me located at: 9434 Marlowe . . . I fully understand that items obtained may be used in evidence. I have not been threatened, nor have any promises been made to obtain my consent." John Gilmore read the form, spelled out his name on it, and signed the form at 4:10 p.m. Det. Livingstone wrote his initials on it. (Gov. Ex. 1.) Before signing the form, John Gilmore did not ask the officers what would happen if he did not sign the consent form and Det. Livingstone never said that, if he did not sign, he would lose his home.[1] No threats or

---

[1] John Gilmore testified at the suppression hearing as a defense witness that, when he was asked whether he would consent to a search of his residence, he asked the officer what would happen if he did not consent and the officer responded that if the police conducted an "involuntary" search and drugs were found, he could lose the house. John Gilmore testified that he consented to the police search, because he did not want to lose his house. He also testified that he never told the officers that he wanted his son Aaron out of the house because of drug trafficking.

After observing both witnesses, the undersigned credits Det. Livingstone's testimony. This is because the record is clear that, although John Gilmore testified that he did not tell the police he wanted Aaron out of the house due to drug trafficking, he testified variously on cross-examination that he had called the police three times about

other compulsion were used to get John Gilmore to cooperate with the police or to consent to the search. The officers displayed no firearm to John Gilmore. At no time during the stop and conversation did the officers intend to arrest John Gilmore and he was not arrested. This contact between the officers and John Gilmore lasted approximately 10 minutes.

5.      Soon after John Gilmore signed the consent to search form, Det. Livingstone was advised by radio that an undercover officer saw a hand-to-hand sale of crystal methamphetamine by Aaron Gilmore to a cooperating individual in front of 9434 Marlowe. John Gilmore did not hear this radio report.

6.      Next, Det. Livingstone asked John Gilmore if he would return to his residence with him in a police vehicle and asked that Det. Griffin drive Gilmore's truck back there. Livingstone wanted to have more opportunity to talk with John Gilmore on the trip to the residence. Gilmore agreed and showed Det. Griffin how to use the truck's clutch. The officers drove both vehicles back to 9434 Marlowe; John Gilmore rode with Det. Livingstone.[2]

7.      Det. Livingstone parked across the street from 9434 Marlowe. He saw a woman, later identified as Nicole Ellis, Aaron Gilmore's girlfriend, run up the front steps of the residence onto the porch. Det. Martin got out of the vehicle and followed Ellis up the steps. Livingstone also got out of the police vehicle, but asked John Gilmore to

---

Aaron, but that he never knew Aaron had guns there or sold drugs there. He also testified on cross-examination that he read the consent form before he signed it.

In rebuttal, Officer William Martin, who was present at the traffic stop, testified that he heard John Gilmore tell Det. Livingstone that he was aggravated and tired of the drugs in his house and the he had been trying to get Aaron, his girlfriend, and their young child out of the house. Officer Martin also testified that John Gilmore was very cooperative with the officers and relieved that the police were helping him.

[2] John Gilmore testified to the contrary, that he himself drove his own vehicle back to his residence. The undersigned credits the testimony of Det. Livingstone to the contrary, because Livingstone's stated reason, to give him an opportunity to speak further with Gilmore, was reasonable.

remain in it, which he did.  Det. Livingstone told the other officers about John Gilmore's oral and written consent to search the house.

8.      On the front porch while Aaron Gilmore and Det. Seery were conversing calmly inside the open doorway, Gov. Ex. 2, Ms. Ellis screamed at Aaron Gilmore, "Aaron, what are you doing?  Don't let them in."  As she said this she knocked Det. Seery strongly against the doorjamb.  Det. Martin grabbed Ms. Ellis.  She swung and struck Det. Martin.  Det. Martin took her down onto the floor of the porch and arrested her for assault.    During the scuffle with Ellis, Det. Livingstone also ran onto the porch.

9.      When everyone had calmed down, Det. Livingstone had everyone go inside the house.  He then brought John Gilmore into the residence from the police vehicle.  Ms. Ellis was taken into the kitchen by Det. Griffin where she sat handcuffed in a chair.  Everyone else, i.e., the two Gilmores and Dets. Livingstone, Seery, and Martin, remained in the living room.   Ellis never complained of any pain or injury during or following her arrest. [3]  Between the kitchen and the living room were the dining room and a five-foot long walkway into the kitchen.

10.     In the living room, all the officers were in plain clothes.  No officer had a weapon drawn.  Det. Livingstone spoke with Aaron Gilmore and told him about the investigation and that his father had consented to the officers searching the residence.  He showed Aaron the written consent form.  During this conversation, Aaron kept shaking his head at his father apologetically, telling him he was sorry.  In a concern for officer and occupant safety, because they would be moving through the house, Det. Livingstone asked Aaron whether there were any firearms in the house.  Aaron responded in the affirmative.  Aaron Gilmore's attitude was very cooperative.

11.     Aaron then led Dets. Livingstone and Martin back to his room.  To get there, they had to walk through John Gilmore's room.  As they did so, Aaron told the officers that his father had a rifle or a shotgun in his closet.  Det. Livingstone told Aaron

---

[3] Ms. Ellis testified for the defense at the suppression hearing that she tried physically to prevent the police from entering the residence and that she never filed a complaint with authorities over the police matter at the residence.

that he was not interested in his father. When they reached Aaron's room, Aaron continued to be cooperative.

12. Aaron's bedroom was small. It contained a bed, a safe in a corner, and a night stand. He sat on his bed and told Det. Livingstone that there was a gun near where he, Aaron, was sitting. Det. Livingstone then found and seized a Ruger pistol in a case from a location very near to Gilmore. (Gov. Exs. 3, 4.) At that time, knowing Aaron had a felony conviction, Det. Livingstone placed Aaron formally under arrest for being a felon in possession of a firearm and handcuffed him.

13. Next, Det. Martin advised Aaron of his constitutional rights to remain silent and to counsel, by orally reading them from a card. At that time, Aaron indicated that he waived these rights. Aaron Gilmore agreed to speak to the officers and to cooperate with them. The handcuffs were removed from Aaron. During this time in Aaron's room, Aaron's father and his girlfriend were not in that room.

14. While still in Aaron's room, Aaron asked the officers to call "Juengst" for whom Aaron said he was working as a cooperating individual. Det. Ray Juengst was known by Det. Livingstone to be the commander of the St. Charles County Regional Drug Task Force. Det. Livingstone had had no information that Aaron Gilmore was working with Det. Juengst. Det. Livingstone then phoned Det. Juengst and told him he had just arrested Aaron Gilmore and the reason for the arrest. In response, Det. Juengst said that Aaron Gilmore was supposed to be cooperating, but that he had done nothing in that regard.[4] He told Det. Livingstone to do what he had to do and their conversation

---

[4] In January 2015, Det. Juengst's police unit arrested Aaron Gilmore. Aaron said he would cooperate with the police. Det. Juengst told Aaron he should help the police in its investigation of Aaron's drug source, Cameron Moore. Thereafter until May, Det. Juengst met with Aaron a number of times, by phone, text messaging, and in person. Aaron Gilmore was one of several people cooperating with Juengst regarding Cameron Moore. Gilmore gave the police several names, but none of them panned out. Juengst had never given Aaron money to buy drugs or given him permission to possess any firearm, because Aaron was never able to develop an opportunity to buy drugs. Juengst determined that the time was running out for Gilmore to cooperate. Ultimately Moore

ended.  Det. Livingstone's investigation had not involved and did not involve St. Charles County.   At this turn of events, Aaron Gilmore became a little upset but then calmed down.

15.     Then, Det. Livingstone asked Aaron about the safe that he saw in Aaron's room.  RL had told the officers that narcotics were kept in the safe.  Aaron said there was nothing in it, but that the officers were free to look in it.  Aaron had a key to the safe on his wrist.  However, he had difficulty opening the safe because his key was bent.  Det. Griffin and Aaron together worked together to successfully open the safe.  Inside the safe was a closed gun box.  (Gov. Ex. 5.)  Det. Livingstone opened this box without any objection from Aaron.  Inside the safe were a pistol and ammunition.  A coin collection was also found in the safe.  (Gov. Ex. 6.)  When Det. Livingstone saw the firearm, he again handcuffed Aaron Gilmore for security reasons, until he seized the case and the firearm.  After Livingstone secured the firearm, he again removed the handcuffs from Aaron.   The officers did not seize the coin collection.

16.     When Aaron saw this firearm, he stated, without being asked any question, that he did not know that that firearm was in that case.  Rather, he said, he thought a different firearm was in that case.

17.     The officers saw in plain view around the bedroom various pipes for smoking methamphetamine.  Inside the pipes the officers saw white residue, which they knew from experience and training was methamphetamine.  They seized the pipes.

18.     After approximately 20 minutes in the bedroom, the officers and Aaron returned to the living room.  At that time Aaron remained under arrest, but he was not in handcuffs.

19.     In the living room facing the front door was a recliner chair, which the police searched for security.  From inside the recliner, the officers found and seized a bundle of $4,379.00 in cash, which the police seized.  The location of the recliner and the

---

was arrested, but without any investigative help from Aaron Gilmore.  By May 29, 2015, Juengst did not consider Aaron Gilmore a cooperating individual.

bundling of the money indicated to the police that this money was involved in narcotics trafficking.   John Gilmore did not claim the money was his.

20.     During the time the officers were on the premises of 9434 Marlowe, a local police K-9 officer came to the residence.  Det. Livingstone heard the dog bark.  However, the K-9 officer and the dog never entered the residence.  They ultimately left without performing any investigative duties. By this time, Aaron Gilmore's girlfriend, who had been arrested, had been taken to the police station.

21.     Next, with Aaron Gilmore seated on the floor leaning against the wall in the living room, Det. Livingstone knelt next to him and told Aaron that he knew there was "crystal meth" on the premises.  Livingstone told Aaron that they did not want to "toss" the house to find it.  Aaron denied there was meth there.  At this time, John Gilmore was in the kitchen sitting with a glass of water.  In the living room, Aaron kept saying, "Ray, Ray, Ray," referring to Det. Ray Juengst.  Aaron appeared frustrated, but never said he did not want to speak with the police any more.   Det. Livingstone then told Aaron Gilmore that the police were not leaving until they found the drugs.

22.     In response, Aaron said, "Okay," stood up, and took Det. Livingstone through the kitchen, out the back door, to a location behind the garage.  (Gov. Ex. 7.) There, Aaron kicked at rocks on the ground, knelt down and dug in the rocks until he found a large bag which he handed to Det. Livingstone.  (Gov. Ex. 8.)  Det. Livingstone opened the bag and saw and seized several bagged quantities of crystal methamphetamine and marijuana.  Then, all returned inside the house.

23.     Back inside the house, Aaron, still not in handcuffs, continued to cooperate with the officers.  He told them that he and Cameron Moore share a commercial storage locker out on Olive Rd.  Aaron said there might be crystal meth there that belonged to Moore.  Det. Livingstone recollected his investigation of Moore.  However, Livingstone was unaware of the storage locker.  Gilmore told the officers that he would take them to the storage locker.

24.     John Gilmore remained at the residence; he did not go with Aaron and the police to the storage locker.  During the police presence in his residence, John Gilmore

never objected to the police activity. Rather, he repeatedly told the officers that he had repeatedly talked to the Overland Police Department about Aaron and his girlfriend, but the Overland police never did anything about it.

25.     Next, the police and Aaron, in several cars, traveled to this commercial storage locker facility on Olive Road. The vehicle in which Aaron Gilmore rode with Det. Martin led the way, followed by Dets. Livingstone and Griffin in their vehicle, which was followed by Det. Seery driving alone. From inside his vehicle, Det. Livingstone could see that Det. Martin and Gilmore both smoked cigarettes.

26.     The trip to the commercial locker facility, located at Olive and Highway 170 took approximately 5 minutes. Once there, Aaron provided the police with the code that opened the gate to the storage facility grounds. Then he took the officers to his and Moore's locker. Outside the locker was a motorcycle, which Gilmore laughingly said the police would likely find was stolen, "In fact, I'm pretty sure it's stolen." Gilmore opened the locker door with a key. Gilmore and Det. Martin entered the locker. Livingstone and the other detectives remained outside, alert for the possible appearance of Cameron Moore on a motorcycle, because Gilmore had said, "Cameron comes here all the time." Livingstone positioned himself so that, if Moore drove up and tried to flee, Livingstone could stop him.

27.     Aaron Gilmore continued to cooperate with the police. Inside this locker was a safe which Aaron opened. Inside the safe was a firearm (Gov. Ex. 9), which Aaron Gilmore then said was the one he thought had been in the safe in his room in the residence.

28.     Next, the police took Aaron Gilmore to the St. Ann police station. The office area contained two large couches, a flat screen television, and desks. At that time, Nicole Ellis was in a cell elsewhere in the station. Det. Martin took Gilmore into an interview room.

29.     While Det. Livingstone attended to the paperwork for Nicole Ellis, Det. Martin spoke with Aaron Gilmore. But at one point Det. Livingstone entered the room where Det. Martin was interviewing Gilmore. Livingstone heard Gilmore talk about a

man in the Hillsboro or Festus area, in Jefferson County, Missouri, who won 10 million dollars in the lottery but was still selling "ice."   Livingstone saw Det. Martin and Gilmore on the office computer attempting to identify this man by looking on the lottery website.   This made no sense to Det. Livingstone.

30.     After about ten minutes of listening to their conversation, Det. Livingstone asked Aaron Gilmore why he did not mention Cameron Moore.  Gilmore responded by saying, "I'll call him right now."  Gilmore then phoned Moore on a cell phone and using the phone's speaker so the officers could hear the conversation.  At that time, Livingstone and Gilmore were sitting together on a couch in the office.   In this conversation, overheard by the officers, Moore told Gilmore that he had heard that the police had been at Gilmore's house and took his "shit."   Gilmore told Moore that he was not there when that happened.  Moore responded, "Someone said he saw someone walking around and thought it was you," which Gilmore denied.  Moore asked Gilmore whether the police got Gilmore's "shit."  Gilmore said, "Yeah, they got it all, but I wasn't home" and "No, man, it wasn't me."   Det. Livingstone speculated that, while the police were at the residence, a friend of Moore and Gilmore drove by the residence and told Moore what he or she saw.  Then Moore told Gilmore, "We need to take a train ride," at which they both laughed.  Moore asked Gilmore whether he went to the "shed," meaning the commercial storage locker.  Gilmore said, "Yes.  I have your thunder."  Moore said he needed it back, for my protection.  Gilmore then told Cameron, "I'll get back to you."  Gilmore then hung up the phone conversation.

32.     After the Moore-Gilmore conversation ended, Gilmore, referring to Moore's use of "train ride," told Det. Martin, "He's going to kill me.  I'm so scared he is going to kill me, man.  'Train ride' means he is going to take me on a train ride to kill me."   Livingstone believed Gilmore's statement about Moore going to kill him was untrue, because, from prior investigative information he knew that Moore's use of "train ride" referred to Moore's trip by train to Chicago and Indiana to get crystal meth from Moore's cousin.    Livingstone told this to Gilmore.   Gilmore appeared surprised that Livingstone knew this and told Livingstone that he had been there himself once or twice.

33.     After the conversation with Moore, Gilmore said he would cooperate with the police.  Gilmore then stepped outside the police office and had a brief discussion with Det. Martin.  When they returned, Det. Martin told Livingstone that he believed Gilmore, that Gilmore was going to cooperate, and that they should let him go.  The officers told Gilmore that, if he didn't cooperate, he would be charged.  Aaron Gilmore was then released from custody and left the police station on his own.  Thereafter, Gilmore never contacted the police.

34.     Throughout the time the police and Gilmore were together, Gilmore never objected to the officers searching the house or the storage locker, he appeared to understand all the questions the officers asked him, he never asked for an attorney, and he never objected to the conversations in which he made statements.   The longer he was with the officers on that day the more he appeared interested in cooperating.

## **DISCUSSION**

### Motion to suppress

Defendant Gilmore has moved to suppress the physical evidence seized by the police on May 29, 2015, and the statements he made to the police, and in the presence of the police, that day.  He argues (1) regarding the search of the premises at 9434 Marlowe that (a) John Gilmore's consent was not freely and voluntarily given; therefore, his consent was not a constitutional basis for the warrantless search of his residence; and (b) the search exceeded the scope of the consent; and (2) defendant's statements were given (a) without him being given his Miranda warnings, (b) following his unlawful arrest, and (c) through threats and intimidation.  Because the police acquired this evidence without any warrant, the government bears the burden of proof on the issues before the court. Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968).

### John Gilmore's consent to the search

Det. Livingstone and the other officers of the St. Ann drug unit learned of Aaron Gilmore for the first time on May 29, 2015.  Thereafter, they established surveillance of Gilmore's residence at 9434 Marlowe.  When they saw John Gilmore, Aaron's father,

leave the house, the officers followed and stopped him. At that location away from the residence, John Gilmore expressly consented to the officers' searching his premises at 9434 Marlowe. Following John Gilmore's consent, the officers entered the residence and seized drugs and firearms from it.

A warrantless entry and search of a residence is constitutional, if it is supported by the voluntary consent of someone with authority over the property, <u>Fernandez v. California</u>, 134 S. Ct. 1126, 1131-32 (2014), and the police reasonably believed that the individual had the required authority and voluntarily consented. <u>United States v. Nichols</u>, 574 F.3d 633, 636-37 (8th Cir. 2009). John Gilmore's consent was voluntary, if it was freely given and not coerced by the police. <u>United States v. Bradley</u>, 234 F.3d 363, 366 (8th Cir. 2000). In making these determinations, the court must consider such factors such as John Gilmore's age, his intelligence, whether he was intoxicated, whether he had been advised that he did not have to consent, and whether he had previous experience with the police. <u>Id.</u>; <u>see also</u> <u>United States v. Johnson</u>, 619 F.3d 910, 918 (8th Cir. 2010). Also relevant is whether or not the officers told him that, if he did not consent to the search, the search would still occur and, if contraband was found, he stood a chance to lose his house, as defendant argues happened. <u>Cf.</u>, <u>United States v. Harrison</u>, 639 F.3d 1273, 1279-80 (10th Cir. 2011) (consent may be constitutionally involuntary if police tell the individual that he has no choice but to consent to a search); <u>United States v. Vazquez</u>, 724 F.3d 15, 24 (1st Cir. 2013) (police may not unreasonably tell an individual that police will obtain a search warrant if individual does not consent).

The officers who entered 9434 Marlowe reasonably believed John Gilmore voluntarily consented to their entry and search of the premises. The police knew John Gilmore is a man of mature age; that he is a father; and that he owns the property the police searched. They knew he was reasonably intelligent; he personally reconstructed a motor vehicle from disparate parts. No evidence indicated he was intoxicated when he consented. While the record does not indicate that he was told he did not have to consent or whether he had prior criminal law experience, the undersigned has found that, contrary to not wanting to consent, he had previously several times asked local police for help

with the drug activity his son and his girlfriend were bringing to John's residence. He readily consented, orally and in writing, to the police intervening by entering and searching his home.

Defendant argues that the police coerced John into consenting by telling him he risked losing his home, if the police searched without his consent and contraband was found. For the reasons set out in footnote 1, the undersigned believes that John Gilmore did not ask what would happen if he did not consent. Such a question would demonstrate a mindset contrary to police intervention; rather, he wanted the police to help him with his son and his illegal drug activity at the residence. John Gilmore signed his name immediately below the statement, "I have not been threatened, nor have any promises been made to obtain my consent." (Gov. Ex. 1.) Further, John Gilmore never objected to the officers' entry into the house nor their investigative activity inside it. United States v. Rogers, 661 F.3d 991, 995 (8th Cir. 2011) (failure to object is a factor that indicates a voluntary consent to a search); United States v. Johnson, 619 F.3d at 918.

For these reasons, John Gilmore's express consent for the police to search his residence was freely given, was not coerced by the police, and was reasonably relied upon by the police.

Defendant argues that the police exceeded the scope of John Gilmore's consent. The constitutional scope of his consent is what a reasonable person would determine John Gilmore intended when he gave his consent. Florida v. Jimeno, 500 U.S. 248, 251 (1991); Fagnan v. City of Lino Lakes, Minn. 745 F.3d 318, 323 (8th Cir. 2014); United States v. Urbina, 431 F.3d 305, 310 (8th Cir. 2005). Assessing the totality of the circumstances known by the police, including John Gilmore's orally expressed purpose that the police remove his son's criminal drug activity from the residence, a reasonable person would believe that John Gilmore intended that the police do what the police actually did. They ended up removing drugs, firearms, and the proceeds of drug sales from the house and drugs from an area in his backyard.

<u>Defendant's voluntary consent to search and waiver of Miranda rights</u>

Not only regarding their entry into and their activity inside the premises at 9434 Marlowe did the police act reasonably, but also in their dealings with defendant. They first directly encountered Aaron on the porch of his father's home. Inside the residence the police showed Aaron Gilmore his father's signed statement giving them consent to search the premises. Inside the residence, whether or not Aaron was in custody for the purposes of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), Det. Livingstone, out of a reasonable concern for the safety of all, without having advised Aaron of his <u>Miranda</u> rights, lawfully asked him whether there were firearms in the house. He did this out of a concern for the safety of all. <u>New York v. Quarles</u>, 467 U.S. 649, 655-56 (1984).

At that time Aaron's mindset was twofold. On the one hand, he was apologetic to his father for causing the developing police incident in his father's home, and on the other hand he was hoping his cooperation with the police would gain him leniency, as he had earlier hoped regarding Det. Ray Juengst's investigation. Neither of these concerns were caused by Det. Livingstone or the other officers on May 29, 2015.

When asked about the presence of firearms in the residence, Aaron readily and voluntarily led Det. Livingstone through the house into his bedroom. These were actions consistent with consent on which Det. Livingstone reasonably relied. <u>United States v. Correa</u>, 641 F.3d 961, 967 (8th Cir. 2011) (detained subject's age, sober demeanor, compliance with the police directions, and his failure to object to them were a sufficient basis for officer to reasonably believe subject voluntarily consented to search). Further, the same factors that indicated John Gilmore's consent to the police entering and searching for evidence of his son's drug trafficking also indicated that defendant consented to Det. Livingstone going into his bedroom for the firearm defendant knew was there. Defendant was acutely aware of his criminal liability for his drug activities. He and the detective knew he had previously been convicted of a felony offense. As stated, defendant wanted leniency for helping the police. Inside the bedroom, defendant continued to be cooperative.

After Det. Livingstone found and seized the firearm, he lawfully arrested Aaron Gilmore without a warrant. A warrantless arrest may be made lawfully under the Fourth Amendment on probable cause, that is, when the officer has knowledge sufficient to cause a reasonable person to believe the subject was then committing a criminal offense, such as possessing a firearm after having been convicted of a felony. Beck v. Ohio, 379 U.S. 89, 91 (1964). Defendant's voluntary statements in his bedroom regarding the seized firearm and the actual location of the firearm near him, as he stated, established probable cause for his arrest.

Following Aaron Gilmore's lawful arrest, Det. Martin orally advised Gilmore of his constitutional rights to remain silent and to counsel, as required by Miranda v. Arizona. Defendant indicated that he waived his rights by continuing to speak with the police, further demonstrating his cooperative mindset. North Carolina v. Butler, 441 U.S. 369, 373, 375-76 (1979) (waiver of right to remain silent, while not explicit, was constitutionally sufficient because subject volunteered incriminating statements).

Without being questioned or coerced, defendant Gilmore, in an attempt to gain favor and leniency, voluntarily told the officers he had been working with Det. Juengst, whom they knew, providing him with information about criminal activity. Defendant asked Livingstone to verify that this was true by calling Juengst, which Det. Livingstone did. However, the information Livingstone received was that defendant had not provided any valuable information.

Defendant Gilmore continued to give constitutionally voluntary statements. Defendant voluntarily aided the officer in opening the safe in his bedroom, after telling the officers they could look in it. Nothing Det. Livingstone did in the bedroom, or anywhere, coerced defendant into continuing to cooperate or prevented him from stopping his cooperation. United States v. Guevera, 731 F.3d 824, 829-30 (8th Cir. 2013). Thus, with defendant's voluntary consent and his aid in opening the safe, a second firearm and ammunition inside it were constitutionally seized. When the second firearm was secured, Det. Livingstone removed the handcuffs from defendant. When he saw the firearm, defendant spontaneously, without being asked any question, stated he thought a

different firearm was inside the safe. This statement was not coerced and thus was voluntary.

Also, the officers saw in plain view in the bedroom pipes with white residue on them. The officers reasonably believed from their training and experience the pipes were used to smoke methamphetamine. Under these circumstances, the items being seen in plain view from a place where the officers were lawfully located, they constitutionally seized them without a warrant. Payton v. New York, 445 U.S. 573, 587-88 (1980); United States v. Campos, No. 15-1346, 2016 WL 1104932 at *2 (8th Cir. Mar. 22, 2016).

Back in the living room, supported by John Gilmore's voluntary consent and to safeguard the officers' and the occupants' security in the residence, the officers lawfully searched the recliner chair. The cash found in the recliner was reasonably believed to be the proceeds of drug trafficking, because of the chair's being near the front door of the residence, from which methamphetamine had been sold, and because the cash was rolled in the fashion drug traffickers deal with drug proceeds.

Because Det. Livingstone believed a substantial amount of methamphetamine was yet on the premises, and with John Gilmore's voluntary consent to search the premises for drugs, Det. Livingstone gave Aaron Gilmore the choice of not disclosing where the drugs were or requiring the police to search the residence to find the drugs. Defendant did not then withdraw his consent to cooperate with the police. See United States v. Guevera, 731 F.3d at 829. Rather, without being coerced by the police, and in his continuingly cooperative mindset, defendant led Det. Livingstone through the residence and out the back door to where the bag of narcotics had been buried. Defendant, on his own volition, because the officer did not know where the drugs were, voluntarily dug up the drugs and put them in plain view. Det. Livingstone lawfully seized them without a warrant.

Defendant argues that his father consented only to the search of the premises for drugs. John Gilmore consented to the police searching the premises at 9434 Marlowe. There is no evidence that John Gilmore intended that only the house located at that address be searched. He wanted the drugs gone and a reasonable person, assessing the

circumstances, would believe that, if John Gilmore knew drugs were located out in the back where they were actually dug up and found, he would have expressly consented to the officers going out back with his son and seizing what his son dug up.

The seizures of items from defendant's bedroom, including the firearm inside the safe and the smoking pipes seen in plain view in that room, and the seizure of the narcotics which were unearthed by defendant in the backyard were constitutional because they were based upon defendant's implied consent and his father's expressed and implied consent. At no time did defendant or his father object to the officers' search and seizure activities inside or outside the house.

Back in the house, defendant continued to cooperate with the officers in the hope of receiving leniency. Without coercion and without handcuffs, defendant told the officers about the commercial storage locker that he and Cameron Moore used. Det. Livingstone, of course, knew about Moore, but he had not known about this locker. Defendant voluntarily took the officers to the locker and opened it for them with a key.

Inside the commercial locker was a safe which defendant voluntarily opened for the officers. Inside the safe was a firearm which the officers seized. At this time, without being questioned, defendant spontaneously, without coercion, stated that he had previously believed this firearm had been in the safe in his bedroom. This statement, not being coerced by the police, was constitutionally voluntary.

After the search of the locker, the officers took defendant to the police station. There, still in a very cooperative mood, defendant offered to call Cameron Moore and did so. Using the phone's speaker mechanism so the officers could hear his conversation, he spoke with Moore. The statements by defendant in this conversation with Moore were not coerced, and thus were constitutionally voluntary. And they followed his earlier being advised of his Miranda rights, which he understood and implicitly waived.

The officers had mixed thoughts about whether defendant would be helpful to their investigation. Nevertheless, they released him from custody without then filing formal charges. He made no more statements to the police.

<u>Motion to dismiss seizure warrants</u>

Defendant has moved to dismiss the seizure warrants issued in Case Nos. 4:16 MJ 1013 JMB and 4:16 MJ 1014 JMB.  (Doc. 42.)  He argues that the money and firearms sought to be forfeited in these cases are the items he argues in his motion to suppress evidence were seized illegally.   He further argues that the outcome of this motion depends upon the outcome of the motion to suppress discussed above.   The undersigned recommends below that the motions to suppress evidence be denied.   Therefore, the motion to dismiss the seizure warrants ought to be denied also.


## ORDER AND RECOMMENDATION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the motions of the United States for a determination by the court of the admissibility or not of the government's arguably suppressible evidence (Docs. 12 oral, 18) are denied as moot.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Aaron Gilmore to suppress evidence and statements (Docs. 11 oral, 39) and to dismiss the forfeiture seizure warrants (Doc. 42) all be denied.

The parties have 14 days to file written objections to this Order and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


**_____/S/   David D. Noce_____**
**UNITED STATES MAGISTRATE JUDGE**


Signed and filed on March 31, 2016.