UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CR 509 SNLJ / DDN |
| | ) | |
| AARON GILMORE, | ) | |
| | ) | |
| Defendant. | ) | |

## SUPPLEMENTAL REPORT AND RECOMMENDATION

On April 25, 2016, this action was referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b) for consideration of the objections of defendant Aaron Gilmore to the Order and Recommendation (doc. 50) filed on March 31, 2016. (Doc. 58.) A hearing on the objections was held on April 29, 2016.

In the Order and Recommendation, the undersigned recommended that the motions of defendant Gilmore to suppress evidence be denied. More specifically, the undersigned found and concluded: (1) On May 29, 2015, defendant's father, John Gilmore, after he responded to a police signal by stopping his motor vehicle and conversing with the police officers, voluntarily consented to the officers' searching his residence. (2) The search and police activity that occurred inside the residence did not exceed the scope of John Gilmore's consent. (3) And defendant's statements were obtained by the police (a) without any constitutional violation, (b) following his lawful arrest, and (c) were constitutionally voluntary, not being induced by threats and intimidation as alleged by defendant. (Doc. 50.)

Defendant Aaron Gilmore has objected to the Order and Recommendation as follows: (1) The motor vehicle stop by the police of his father on May 29, 2015, was unconstitutional and, therefore, any evidence obtained by the police thereafter must be

suppressed as the fruit of the unconstitutional police activity. (2) John Gilmore's consent to the police search of his residence was not knowing and voluntary and, thus, was not constitutional.

At the April 29, 2016 hearing, the parties presented oral argument on their respective positions and the government offered into evidence a police log of calls to the police regarding John Gilmore's residence, Government Ex. 11, to which defendant did not object.

### (1) Police Stop of James Gilmore

As stated, defendant objects that the police stop of his father was unconstitutional. For convenience, the relevant findings of fact from the Order and Recommendation are these:

> 1. During May 2015 Police Detective Timothy Livingstone was a member of a St. Ann, Missouri, police undercover drug investigation unit. During that month, he and other members of the unit, including Dets. William Griffin, Jeff Seery, and Ron Martin were investigating drug dealing in the St. Ann area. On May 29, 2015, around 2:20 p.m., the unit received information from a confidential informant (CI) that CI had just bought a quantity of crystal methamphetamine from RL. Shortly thereafter, Det. Livingstone arrested RL and his wife, DL, and recovered a quantity of methamphetamine from them. In a post-arrest interview, RL stated that his source for the methamphetamine was a person named Aaron Gilmore who resided at 9434 Marlowe in Overland, Missouri, a municipality near St. Ann. That was the first time Det. Livingstone had heard of Aaron Gilmore. Further investigation indicated that Aaron Gilmore's source for crystal methamphetamine was Cameron Moore whom Det. Livingstone had under investigation. RL told Livingstone that Aaron Gilmore lived in the Marlowe residence with his father John Gilmore, his girlfriend, and her child. The earlier investigation of Moore had not indicated any involvement of Aaron Gilmore. A record check of Aaron Gilmore then indicated that he had previously been convicted of a felony offense in the Missouri state courts.
>
> 2. Thereafter, at approximately 4:00 p.m. on May 29, 2015, in an unmarked police vehicle, Dets. Livingstone and Griffin, in an undercover capacity, drove to a location approximately 100 yards of Aaron

> Gilmore's residence at 9434 Marlowe. From this location they saw John Gilmore, Aaron's father, leave the residence and drive away by himself in his distinctive vehicle, a combination of an S-10 truck with a Corvette rear end. They followed the truck to a location on Roseland, about three miles from 9434 Marlowe. At that location on Roseland, using a distinctive "chirp" sound from their air horn, without flashing their police emergency lights and without using the siren, the officers stopped the truck. They exited their police vehicle and walked up to the truck, Det. Livingstone toward the driver's side window and Det. Griffin, within earshot of Det. Livingstone, at the right rear of the truck for security. Both officers were in plain clothes; they were armed, but neither had drawn his weapon. Only John Gilmore was in the truck. The purpose of the stop was to explain to him what they knew about the drug dealing occurring in the Marlowe residence. John got out of his truck and spoke with Livingstone alongside the truck.

(Doc. 50 at 1-2.)

The government and defendant would augment these findings of fact by the unobjected-to addition of facts indicated by the police log of calls to the police regarding John Gilmore's residence, 9434 Marlowe, Overland, Missouri, Government Exhibit 11. The undersigned has determined that this document is not close enough in time to May 29, 2015, when the relevant events occurred, to persuade the court that the facts indicated by this document,[1] which although true, have anything substantial to do with affecting the events of this date.

---

[1] This document establishes that on May 30, 2014 at 7:03:40 p.m. the police received a request "TO REMOVE AN ERIN [read AARON] GILMORE FROM THE HOUSE--FATHER AND SON ARGUING BACK AND FORTH"; that on June 17, 2014, at 8:30:13 p.m. the police received information that "father on porch, son and son's girlfriend fighting inside residence;" and that on November 26, 2014, a police notation was made that "son won't leave the house." (Gov. Ex. 11 at 1-2.) The government argues that these facts support the fact that John Gilmore wanted police help to evict his son Aaron and his girlfriend from John's residence; and defendant argues that this document belies the evidence that John Gilmore's anger at his son was based on his son's drug dealing out of the residence.

3

In its response to defendant's objection, the government argues (a) defendant Aaron Gilmore lacks standing to complain of the legality of the police stop of his father and (b) defendant may not make this argument now because he did not make it before the undersigned in his motion to suppress evidence. Defendant argues strenuously that he did not waive this argument. The undersigned believes that, without deciding whether or not defendant waived the argument, the court ought to resolve the objection on its merits.

The objection should be dismissed for two reasons. First, defendant Aaron Gilmore does not have standing to complain about the police vehicle stop of his father as violating his father's Fourth Amendment rights. He can seek the suppression of evidence as unconstitutionally obtained only if his own constitutional rights were violated by the police activity. United States v. Salvucci, 448 U.S. 83, 95 (1980) ("We are unwilling to tolerate the exclusion of probative evidence under such circumstances since we adhere to the view of *Alderman* [394 U.S. 165 (1969)] that the values of the Fourth Amendment are preserved by a rule which limits the availability of the exclusionary rule to defendants who have been subjected to a violation of their Fourth Amendment rights."); Rakas v. Illinois, 439 U.S. 128, 134 (1978).

The second reason defendant's objection should be dismissed is that no constitutional right of his father was violated by the police officers' stop of his father. This is true for two reasons. First, after considering the entirety of the circumstances of the stop, the undersigned concludes that the officers did not seize James Gilmore for Fourth Amendment purposes when they caused their police vehicle's air horn to "chirp" to signal him that the officers wanted to talk with him.

---

The undersigned rejects both arguments, because May, June, and November 2014 are too distant in time from May 2015 to support a finding that these calls to the police indicate anyone's state of mind in May 2015, and because the fact that these reported calls did not involve drug dealing does not indicate that John Gilmore did not otherwise complain to the police about his son's and his girlfriend's drug dealing from his residence.

4

> Not every encounter between a police officer and a citizen constitutes a seizure under the Fourth Amendment. Only when the officer, by means of physical force for show of authority, has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred.

United States v. Mabery, 686 F.3d 591, 595-96 (8th Cir. 2012) (internal citations omitted). Facts that could indicate to a reasonable person that he or she was not free to decline the officers' contact are coercive in nature and can include the number of officers present, a physical touching of the person, and language or tone of voice that could indicate that the person had no choice but to submit to the police contact. Id. at 596. In Mabery, the officers

> were on patrol on April 14, 2010. At about 3 a.m., they saw a Jeep in an apartment building parking area. The Jeep was backed in, facing the street; the dome light was on and the vehicle was occupied. [Officer] True said that when the occupant of the vehicle saw the police, the occupant tried "to kind of hide from me and turn the dome light out in the vehicle." True said that there had been "trouble with this apartment complex[.]" so he stopped, backed up, and spotlighted the Jeep. [Officer] Cisneros activated the rear emergency lights on the police car, because the car was stopped in the street, blocking traffic.

Id. at 594. Under these quoted circumstances, the Court of Appeals concluded that the mere spotlighting of the vehicle did not effect a seizure under the Fourth Amendment. Id. at 597.

In the case at bar, the officers did not activate either their vehicle's siren or emergency lights. Instead, they activated the police vehicle's air horn to emit a "chirp" sound. This is functionally the equivalent of the officers, who were in a moving vehicle, getting the attention of John Gilmore, also in a moving vehicle, in a non-threatening manner. A reasonable person in John Gilmore's circumstances, when so signaled by a police vehicle could believe he had the right to continue on his way, but could also decide to stop to see what the officers wanted and then decide whether to go on his way. The officers did not cause him to stop in a coercive manner or show of authority that was a stop under the Fourth Amendment.

Second, even if the officers' "chirping" John Gilmore was the equivalent of a Fourth Amendment stop, which the undersigned does not conclude, they were authorized to do so because they had reasonable, articulable facts that established a reasonable suspicion that John Gilmore could be involved in criminal activity. Terry v. Ohio, 392 U.S. 1, 21 (1968). In the case at bar, the officers had reasonable grounds to believe that someone named Aaron Gilmore had that day sold crystal methamphetamine and resided at 9434 Marlowe, the residence from which the officers saw this gentleman drive away. The officers were authorized to stop him for a reasonable period of time to further investigate his activity. This determination is an objective one, based on the relevant historical facts in the totality of the circumstances. United States v. Farnell, 701 F.3d 256, 261-62 (8th Cir. 2012). The fact that the officers intended to ask him whether he would consent to their searching 9434 Marlowe does not detract from the constitutionality of the stop, because for this analysis the officers' subjective intent is not relevant. Whren v. United States, 517 U.S. 806, 813 (1996) ("the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." [quoting Scott v. United States, 436 U.S. 128, 136 (1978)]; United States v. Brooks, 290 App'x 955, 958 (8th Cir. 2008).

Defendant invokes the Eighth Circuit's ruling in United States v. Yousif, 308 F.3d 820 (8th Cir. 2002). The facts of Yousif are inapposite to the facts at bar, because they involved the Sugar Tree Road surreptitious "ruse checkpoint" designed to catch motorists on Interstate Highway 44 who were knowingly transporting drugs. The facts involved uniformed officers one of whom directed Yousif to drive to a specific location for a traffic stop-type investigation. 308 F.3d at 824. No such ruse or surreptitious investigative activities occurred in Gilmore's case. Neither his father nor his father's vehicle were seized or searched, but rather the police drug investigation was truthfully described to him. He was immediately cooperative with the police.

6

Defendant argues that the police should have endeavored to obtain a judicial search warrant for 9434 Marlowe and should not have sought John Gilmore's consent to search. Nothing in the Fourth Amendment or any common law rule requires this. Whether or not the police believed they had sufficient information to prove probable cause for the issuance of a judicial search warrant, they could lawfully decide to not seek a warrant and instead seek the voluntary consent to search from a person with apparent authority over the place the police wanted to search. Fernandez v. California, 134 S. Ct. 1126, 1136-37 (2014) ("A warrantless consent search is reasonable and thus consistent with the Fourth Amendment irrespective of the availability of a warrant.").

For these reasons, defendant's first objection to the Order and Recommendation is without merit.

### (2) John Gilmore's Consent to Search

Defendant Aaron Gilmore objects that his father's consent to the police search of 9434 Marlowe was not knowing and voluntary. For convenience, the relevant findings in the Order and Recommendation are as follows:

> 3. Det. Livingstone identified himself to Gilmore as a St. Ann narcotics officer. John Gilmore, who appeared to be in his mid-60's, told Livingstone he was hard of hearing. In a louder than normal voice, Livingstone described to John Gilmore the drug investigation that involved his residence on Marlowe. Gilmore said that he knew about his son's drug trafficking at his residence, that his son and his son's girlfriend were constantly fighting, that he had called the St. Ann police to get his son out of the residence, but that he was having trouble evicting his son, his son's girlfriend, and their little boy. John Gilmore said he was tired of the drug activity there. Without coercion or force, he told the officer that he would help them. Mr. Gilmore appeared to be relieved. John Gilmore was very cooperative and friendly with the officers. He even explained to Det. Livingstone how he built his truck. When asked if he would consent to the officers searching his residence, he answered in the affirmative. He told the officers that he owned 9434 Marlowe. The officers did not threaten John Gilmore, make any promise to him, or tell him he had to consent.

7

4. Det. Livingstone then handed John Gilmore a Consent to Search Property form, Government Exhibit 1. The form had been partially filled in by Det. Livingstone. It stated: "I, John Gilmore, voluntarily consent and agree that an officer or officers of the St. Ann Police Department may search: Premises occupied by me located at: 9434 Marlowe . . . I fully understand that items obtained may be used in evidence. I have not been threatened, nor have any promises been made to obtain my consent." John Gilmore read the form, spelled out his name on it, and signed the form at 4:10 p.m. Det. Livingstone wrote his initials on it. (Gov. Ex. 1.) Before signing the form, John Gilmore did not ask the officers what would happen if he did not sign the consent form and Det. Livingstone never said that, if he did not sign, he would lose his home.[1] No threats or other compulsion were used to get John Gilmore to cooperate with the police or to consent to the search. The officers displayed no firearm to John Gilmore. At no time during the stop and conversation did the officers intend to arrest John Gilmore and he was not arrested. This contact between the officers and John Gilmore lasted approximately 10 minutes.

_____

[1] John Gilmore testified at the suppression hearing as a defense witness that, when he was asked whether he would consent to a search of his residence, he asked the officer what would happen if he did not consent and the officer responded that if the police conducted an "involuntary" search and drugs were found, he could lose the house. John Gilmore testified that he consented to the police search, because he did not want to lose his house. He also testified that he never told the officers that he wanted his son Aaron out of the house because of drug trafficking.

After observing both witnesses, the undersigned credits Det. Livingstone's testimony. This is because the record is clear that, although John Gilmore testified that he did not tell the police he wanted Aaron out of the house due to drug trafficking, he testified variously on cross-examination that he had called the police three times about Aaron, but that he never knew Aaron had guns there or sold drugs there. He also testified on cross-examination that he read the consent form before he signed it.

In rebuttal, Officer William Martin, who was present at the traffic stop, testified that he heard John Gilmore tell Det. Livingstone that he was aggravated and tired of the drugs in his house and the he had been trying to get Aaron, his girlfriend, and their young child out of the house. Officer Martin also testified that John Gilmore was very cooperative with the officers and relieved that the police were helping him.

8

(Doc. 50 at 2-4.) The relevant conclusions of law in the Order and Recommendation are as follows:

### John Gilmore's consent to the search

Det. Livingstone and the other officers of the St. Ann drug unit learned of Aaron Gilmore for the first time on May 29, 2015. Thereafter, they established surveillance of Gilmore's residence at 9434 Marlowe. When they saw John Gilmore, Aaron's father, leave the house, the officers followed and stopped him. At that location away from the residence, John Gilmore expressly consented to the officers' searching his premises at 9434 Marlowe. Following John Gilmore's consent, the officers entered the residence and seized drugs and firearms from it.

A warrantless entry and search of a residence is constitutional, if it is supported by the voluntary consent of someone with authority over the property, Fernandez v. California, 134 S. Ct. 1126, 1131-32 (2014), and the police reasonably believed that the individual had the required authority and voluntarily consented. United States v. Nichols, 574 F.3d 633, 636-37 (8th Cir. 2009). John Gilmore's consent was voluntary, if it was freely given and not coerced by the police. United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000). In making these determinations, the court must consider such factors such as John Gilmore's age, his intelligence, whether he was intoxicated, whether he had been advised that he did not have to consent, and whether he had previous experience with the police. Id.; see also United States v. Johnson, 619 F.3d 910, 918 (8th Cir. 2010). Also relevant is whether or not the officers told him that, if he did not consent to the search, the search would still occur and, if contraband was found, he stood a chance to lose his house, as defendant argues happened. Cf., United States v. Harrison, 639 F.3d 1273, 1279-80 (10th Cir. 2011) (consent may be constitutionally involuntary if police tell the individual that he has no choice but to consent to a search); United States v. Vazquez, 724 F.3d 15, 24 (1st Cir. 2013) (police may not unreasonably tell an individual that police will obtain a search warrant if individual does not consent).

The officers who entered 9434 Marlowe reasonably believed John Gilmore voluntarily consented to their entry and search of the premises.

The police knew John Gilmore is a man of mature age; that he is a father; and that he owns the property the police searched. They knew he was reasonably intelligent; he personally reconstructed a motor vehicle from disparate parts. No evidence indicated he was intoxicated when he consented. While the record does not indicate that he was told he did not have to consent or whether he had prior criminal law experience, the undersigned has found that, contrary to not wanting to consent, he had previously several times asked local police for help with the drug activity his son and his girlfriend were bringing to John's residence. He readily consented, orally and in writing, to the police intervening by entering and searching his home.

Defendant argues that the police coerced John into consenting by telling him he risked losing his home, if the police searched without his consent and contraband was found. For the reasons set out in footnote 1, the undersigned believes that John Gilmore did not ask what would happen if he did not consent. Such a question would demonstrate a mindset contrary to police intervention; rather, he wanted the police to help him with his son and his illegal drug activity at the residence. John Gilmore signed his name immediately below the statement, "I have not been threatened, nor have any promises been made to obtain my consent." (Gov. Ex. 1.) Further, John Gilmore never objected to the officers' entry into the house nor their investigative activity inside it. United States v. Rogers, 661 F.3d 991, 995 (8th Cir. 2011) (failure to object is a factor that indicates a voluntary consent to a search); United States v. Johnson, 619 F.3d at 918.

For these reasons, John Gilmore's express consent for the police to search his residence was freely given, was not coerced by the police, and was reasonably relied upon by the police.

Defendant argues that the police exceeded the scope of John Gilmore's consent. The constitutional scope of his consent is what a reasonable person would determine John Gilmore intended when he gave his consent. Florida v. Jimeno, 500 U.S. 248, 251 (1991); Fagnan v. City of Lino Lakes, Minn. 745 F.3d 318, 323 (8th Cir. 2014); United States v. Urbina, 431 F.3d 305, 310 (8th Cir. 2005). Assessing the totality of the circumstances known by the police, including John Gilmore's orally expressed purpose that the police remove his son's criminal drug activity from the residence, a reasonable person would believe that John Gilmore intended that the police do what the police actually did. They ended up removing drugs, firearms, and the proceeds of drug sales from the house and drugs from an area in his backyard.

(Doc. 50 at 11-13.)

Defendant admits that the undersigned applied the correct legal standards to whether John Gilmore's consent was knowing and voluntary, but argues the undersigned erred in discrediting John Gilmore's hearing testimony that he consented because he feared he could lose his home if the police searched his residence without his consent and found drugs in it. (Doc. 52 at 7-8.)

The undersigned has reconsidered the hearing evidence. However, for the reasons set forth in the original Order and Recommendation, especially quoted footnote 1 set forth above at p. 8, the undersigned continues to believe the true facts were correctly set forth in that document.

For these reasons,

**IT IS HEREBY RECOMMENDED** that the objections of defendant Aaron Gilmore to the Order and Recommendation previously filed (Doc. 50) be denied.

The parties have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

         /S/   David D. Noce
         **UNITED STATES MAGISTRATE JUDGE**

Signed and filed on May 10, 2016.