# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. S1-4:15 CR 509 SNLJ / DDN |
| ) | |
| AARON GILMORE, ) | |
| ) | |
| Defendant. ) | |

## SECOND SUPPLEMENTAL ORDER AND RECOMMENDATION FOLLOWING RETURN OF SUPERSEDING INDICTMENT

Before the court is the motion of defendant Aaron Gilmore to suppress evidence and statements (ECF No. 107), which was referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b). On September 7, 2016, the court conducted an evidentiary hearing on the motion.

Defendant Gilmore is charged by superseding indictment with possessing methamphetamine on January 30, 2015, with the intent to distribute it (Count 1); with possessing five or more grams of methamphetamine on May 29, 2015, with the intent to distribute it (Count 2); and with possessing one or more firearms on May 29, 2015, after having been convicted of one or more felony offenses (Count 3).[1] Defendant Gilmore seeks the suppression of the fruits of the search of a motor vehicle on January 30, 2015, and the suppression of the statements he made after that vehicle was stopped. (ECF No. 107.)

---

[1] Current Counts 2 and 3 of the superseding indictment were charged as Counts 1 and 2, respectively, in the original indictment. (ECF No. 1.) Earlier motions to suppress evidence relating to the original indictment were overruled. (ECF No. 76.) Currently at issue is the government's acquisition of evidence relating to the newly charged January 30, 2015, incident.

From the evidence adduced at the evidentiary hearing held on September 7, 2016, the undersigned makes the following findings of fact and conclusions of law:

## **FACTS**

1. On January 30, 2015, at approximately 11:30 a.m., near the intersection of Main and Fifth Streets in St. Charles, Missouri, Nicole Ellis was driving her green Ford Mustang convertible automobile. Aaron Gilmore, Ms. Ellis's boyfriend of approximately ten years ("off and on") was in the front passenger seat as they were leaving the parking lot of the Ameristar Casino. Ellis and Gilmore had been staying together at the casino hotel. As Ellis drove the Mustang up a hill toward the stoplight at Main and Fifth, a police car activated its red emergency lights behind her. Ellis drove a short distance into a gas station lot and stopped.

2. In the gas station lot, at approximately 11:40 a.m., St. Charles, Missouri, Police Officer Christopher Duke walked up to the driver's door of the Mustang. He told Ms. Ellis that she had driven 33 miles per hour in a 25 miles-per-hour zone. When he asked her for her insurance document and her and her passenger's identifications, Ms. Ellis became belligerent, but ultimately produced her driver's license and that of Gilmore. Officer Duke had had no prior involvement with Ellis, Gilmore, or the Mustang.

3. Officer Duke took the drivers' licenses back to his police vehicle. When he returned to the Mustang and Ellis, she was unable to produce any insurance documentation and she admitted that she had no insurance. She told him that her car was so beat up that she did not insure it. Next, at approximately 11:56 a.m., Officer Duke arrested Ellis for two driving violations: speeding (citing City of St. Charles municipal ordinance § 325.020) and failure to have a valid insurance identification card (citing City of St. Charles municipal ordinance § 360.070). (Def. Exs. D-10, D-11). He decided to

arrest Ellis to ensure her appearance in court, because of her belligerent behavior at the beginning of the stop and her disregard for having insurance.[2]

4. Immediately after he arrested Ellis, Officer Duke called to have the Mustang towed to an impound lot. He did not ask Ellis if she wanted to leave the car at the gas station, because he had seen that the Mustang's convertible cloth top was ripped and its rear window was broken. The officer did not want to leave the Mustang on the public lot in such an insecure condition. He also did not ask her whether she preferred to

---

[2] At the evidentiary hearing, Nicole Ellis testified for defendant Aaron Gilmore as follows. She and Gilmore had been at the Ameristar hotel in the room of an acquaintance, had been the last to leave the room, had grabbed all of the belongings that had been left behind by their acquaintances, and put them in the Mustang. These items included items later seized by the police from the Mustang, including the black backpack where a pipe was found. She could not name the owner of the backpack. Her Mustang is a "clunker" that accelerated slowly. Therefore, she could not have been driving more than 30 miles per hour at the time the officer said she was speeding. Nevertheless, she had not looked at her speedometer before she was stopped. When pulled over, the officer approached her and asked if she knew why she had been pulled over, and she told the officer she did not. He then informed her that it had been for speeding. Ms. Ellis gave the officer her driver's license, Gilmore's driver's license, and the car's registration information. At some point during the stop the officer directed them to keep their hands where he could see them. The officer then took their information back to his vehicle. About five minutes later, the officer went to the passenger side of the car and removed Gilmore from the vehicle, because Gilmore had answered his cell phone, thereby removing his hands from the officer's view. Officer Duke handcuffed Gilmore, set him on the curb, and then searched around and under Gilmore's front passenger seat in the Mustang. The officer then returned to his police vehicle for three or four minutes before returning and asking her to get out of the Mustang. The officer told her she had two options: let him search her car or be placed under arrest for speeding. She refused to consent to the search of the Mustang and for this reason she was arrested. Thereafter, they waited for a female officer to arrive. When the female officer arrived, Ellis was put into her Mustang. She told the female officer that the backpack in the back seat did not belong to them, and that their bags were only in the trunk, where Gilmore had placed them. Finally, Ms. Ellis never received any further official communication about her speeding ticket, and, when she called the court on the day she had been scheduled to appear, she was told they had no record of her speeding ticket. Where their testimonies differ, the undersigned credits the testimony of Officer Duke over that of Ms. Ellis, because of the photographic evidence that indicated only one bag in the back seat and other inconsistencies in her testimony.

3

leave the Mustang in Gilmore's possession, because it was uninsured and the officer did not want it driven in that condition.

     5.     Officer Duke then directed Gilmore to exit the vehicle, which he did. Duke then conducted an inventory search of the Mustang's front passenger compartment. There he found much trash and miscellaneous items. Around 12:00 noon, at the gas station, Officer Duke filled out a Crime Inquiry and Inspection Report/Authorization to Tow form, Form 4569. On the form he inventoried items of value he had found in his search of the car's passenger compartment: a cell phone, a digital tablet, and a purse. (Def. Ex. T-1.) During this search, Officer Duke also found many small plastic bags consistent with narcotics trafficking, a digital scale under the passenger seat where Gilmore had been sitting, and a glass smoking pipe with burn marks and residue in a backpack on the back seat. (Gov. Exs. 3, 4, 5.)

     6.     Officer Duke told both Gilmore and Ellis about the items he found in the vehicle. He orally advised them of their constitutional rights to remain silent and to counsel, which they waived orally. Both Ellis and Gilmore denied ownership of the items found in the vehicle. Because Ellis was already under arrest, and because Gilmore also had access to the contraband in the vehicle, Officer Duke arrested Gilmore for possession of drug paraphernalia and for a seatbelt violation. Duke also considered Ellis a suspect regarding the items found under Gilmore's seat because they were within her reach.

     7.     Shortly after the arrests, more officers arrived at the scene, including St. Charles Police Sergeant Ray Juengst, who had heard about the arrests on the police radio. Sgt. Juengst was then the Commander of the St. Charles Drug Task Force. Officer Duke told Sgt. Juengst what he had found in the Mustang. For this reason and because the licensed operator of the Mustang had been arrested, Juengst directed Duke to have the vehicle towed to the police station and to complete a more thorough, photographic inventory there.

4

8. The Mustang was then towed to the Saint Charles, Missouri, police station and fully searched. Its contents were inventoried with photographs. Near the center console of the car, officers found an eyeglasses case containing five clear bags of suspected methamphetamine. Officers also found and photographed the personal belongings of Gilmore and Ellis throughout the car and in the trunk.[3]

9. On January 30, 2015, the St. Charles Police Department policy for **Towing At Arrest Scenes** was similar or identical to the following:

> Whenever a person in charge or in control of a vehicle is arrested, it is the policy of this department to provide reasonable safekeeping by towing the arrestee's vehicle subject to the exceptions described below. The vehicle, however, shall be towed whenever it is needed for the furtherance of an investigation or prosecution of the case, or when the community caretaker doctrine would reasonably suggest that the vehicle should be towed (e.g., traffic hazard, high crime area).
>
> Situations where consideration should be given to leaving a vehicle at the scene or turning a vehicle over to another in lieu of towing, provided the vehicle can be lawfully parked and left in a reasonably secured and safe condition, include:
>
> - Traffic related warrant arrest.
> - Situations where the vehicle was not used to further the offense for which the occupant was arrested or is not subject to forfeiture proceedings.
> - Whenever the licensed owner of the vehicle is present, willing and able to take control of any vehicle not involved in criminal activity.
> - Whenever the vehicle otherwise does not need to be stored and the owner requests that it be left at the scene or turned over to another,

---

[3] Eighteen photographs were received in evidence during the hearing: four photos were of the exterior of the vehicle; one of the driver's side of the passenger compartment; two of the passenger's side, showing a wallet, tablet, cell phone, and purse; three of the back seat of the vehicle, showing a GPS device and a black backpack; one of the trunk, showing a number of partially-visible large bags or containers, including a "Dewalt" tool case; two close-ups of an open black backpack containing small plastic bags and a pipe; one of the pipe alone; two of the small plastic bags alone; one of the digital scale; and one of the eyeglasses case containing the methamphetamine substance. (*See* Exs. 1-8, S1 to S-13).

> the handling employee shall complete a Tow Option SCPD Form
> 340 including signature of [Arrestee]/Owner/Driver[.]

(Def. Ex. P-502 at 3, Saint Charles Police Department Policy Manual, § 502.5.)

    10. At the time of these events, the St. Charles Police Department policy for **Vehicle Inventory** was similar or identical to the following:

> All property in a stored or impounded vehicle shall be inventoried and listed on the Crime Inquiry and Inspection Report/Authorization to Tow, Form 4569. This includes the trunk and any compartments or containers, even if they are closed and/or locked. Members conducting inventory searches should be as thorough and accurate as practicable in preparing an itemized inventory. These inventory procedures are for the purpose of protecting an owner's property while the owner is in police custody, to provide for the safety of officers and the public, and to protect the Department against fraudulent claims of lost, stolen or damaged property.
>
> If the apparent potential for damage to a locked container reasonably appears to outweigh the protection of the items inside, other options to consider regarding locked containers include, but are not limited to, obtaining access to the locked container from the owner, placing the locked container into safekeeping or obtaining a written waiver of responsibility for the contents of the locked container.

(*Id.* at 502.6.)

    11. On January 30, 2015, it was the routine practice of the St. Charles Police Department to list only items of value over $150 on Inventory Form 4569. It was also the department's routine practice to photograph the property inside an impounded car as a better record of the contents than would be a written list.

    12. Officer Duke was not wearing a body camera on January 30, 2015 nor was there a video camera in his vehicle on that date.

    13. Later on January 30, 2015, at the police station, Sgt. Juengst interviewed Aaron Gilmore. Before asking Gilmore questions, Juengst orally advised Gilmore of his constitutional rights to remain silent and to counsel, by reading them to him from a preprinted Constitutional Rights Warnings Form, Defendant's Exhibit J-1. As he read

each right to Gilmore, Gilmore handwrote his initials next to the statement of the respective right. Gilmore then signed his full name after the following statement:

### WAIVER
Knowing and understanding what my rights are, I am willing to answer questions and/or make a statement at this time.

(Def. Ex. J-1.) Without being intoxicated, threatened, or coerced in any way, Gilmore initialed and signed the Miranda rights form, expressly waiving his rights and consenting to answer Sgt. Juengst's questions.

14. In response to the officer's questions, without coercion Gilmore identified the seized methamphetamine as his own and made a written statement to this effect ("The ICE that was found is mine.") (*Id.* at 2.) Gilmore also identified his source for the drug, who was a major target of the police department's drug task force. Gilmore orally agreed to cooperate with the police as an informant; however, he did not sign cooperating individual documentation. After the interview, the police released Aaron Gilmore anticipating he would provide information about drug trafficking.

15. On January 30, 2015, Nicole Ellis also was released and her traffic tickets were dismissed based on Gilmore's expressed intention to cooperate in the drug investigation.

16. Several times over the next several months, Sgt. Juengst met with Aaron Gilmore in an effort to investigate Gilmore's drug source. Juengst did not advise Gilmore of his rights at these meetings. Gilmore's cooperation with the police did not ultimately lead them to their target and was, as believed by Officer Juengst, largely unsuccessful.[4]

---

[4] Sgt. Juengst testified that the plan was for Gilmore to go "on a buy" from the source and inform the police of the meeting so they could apprehend the source. Juengst testified Gilmore could have provided information to support a search warrant or could have worn a recording device, but the police department did not pursue these options.

## ANALYSIS

Defendant Gilmore moves to suppress the materials found in the Mustang, on the grounds that (1) the arrest of Nicole Ellis was unlawful, (2) the inventory search was unlawful, and (3) Ellis and Gilmore were detained for an unreasonable time. The government responds that defendant Gilmore has no standing to challenge the legality of Ellis's arrest or the search of the Mustang; or, if he does have standing, that the arrest, search, and detention were reasonable and lawful.

### Defendant Gilmore's Standing

A defendant only has standing to challenge evidence obtained in violation of his own constitutional rights. *Rakas v. Illinois.*, 439 U.S. 128, 134 (1978). In the context of an argued Fourth Amendment violation, this means that a defendant only has standing to challenge evidence if he had a subjective and a legally reasonable expectation of privacy in the evidence itself or in the area where it was found. *See Minnesota. v. Carter,* 525 U.S. 83, 88, 91 (1998) (holding a short-term guest did not have a reasonable expectation of privacy in his host's premises and therefore did not have standing to challenge evidence found there).

To determine whether a person has a legitimate expectation of privacy, the Supreme Court has adopted a two-pronged test: first, the defendant must have a subjective expectation of privacy in the place or thing, and second, society must be prepared to recognize that expectation as objectively reasonable. *Smith v. Maryland.,* 442 U.S. 735, 740 (1979). Several factors are relevant to this inquiry, including "ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the property or item; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific

facts of the case." *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000) (*quoting United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994)).

The fact that Aaron Gilmore was not the owner of the Mustang is not dispositive of his standing. Nonowners of a vehicle may still have a subjective expectation of privacy in it and in its containers. *See, e.g., United States v. Edwards*, 632 F.3d 633, 642 (10th Cir. 2001) (finding even when a defendant did not have standing to challenge the search of a car, he had standing to contest the search of his luggage in the trunk because he was traveling and the luggage contained his personal belongings). The Eighth Circuit has held that a "mere passenger" found sleeping in the back seat of a vehicle did not have standing to challenge the search of that car. *United States v. Barragan*, 379 F.3d 524, 530 (8th Cir. 2004).

Defendant Gilmore was not a mere passenger in the Mustang. He had had a substantial relationship with Ms. Ellis at the time of their arrests. His personal belongings were in the trunk and throughout the car, and he and she, the car's owner, were traveling from a stay at a hotel. He had packed the car. At the same time, however, defendant has not put forward any evidence as to his property or possessory interests in the car itself, for example, whether he ever personally operated the car, and how frequently, or whether he paid any expenses related to the car. Furthermore, his relationship with Ms. Ellis was "off and on" and, while they live together now, they were not living together at the time of the search.

After considering all the circumstances before the court, the undersigned concludes that defendant Gilmore had a subjective expectation of privacy in the Mustang and its contents, and that his expectation of privacy in his long-term partner's car was legitimate and reasonable. *Cf., Brendlin v. California*, 551 U.S. 249, 254-56 (2007) (ruling a passenger has standing to challenge the police traffic stop of a car in which he is riding.)

## The Arrest of Nicole Ellis Was Lawful

A Missouri police officer is empowered to perform a warrantless arrest of any person the officer has seen violating any Missouri law or ordinance within that officer's jurisdiction. Mo. Rev. Stat. § 544.216. Missouri law also provides that it is a misdemeanor to operate a motor vehicle without either maintaining an insurance policy or formally self-insuring the vehicle. Mo. Rev. Stat. § 303.025.2(3); *see also* Mo. Rev. Stat. § 303.160. When Officer Duke learned that Ms. Ellis had no insurance on the Mustang and had observed her operating her vehicle, he was authorized to arrest her without a warrant not only for the speeding but also for the lack of insurance.

## The Initial Warrantless Search Satisfied the Inventory Search Exception

Defendant Gilmore argues that the inventory search of the Mustang at the scene of the stop and the towing of the vehicle to the police station violated the Fourth Amendment, because the police did not follow the established department policies. The undersigned disagrees.

The Fourth Amendment prohibits "unreasonable" searches of persons and their effects. U.S. Const. amend. IV. Warrants are the usual method of safeguarding against unreasonable searches, because they require an objective determination, before the search, as to whether a government intrusion is justified. *Cf., Birchfield v. N. Dakota*, 136 S. Ct. 2160, 2186 (2016). The warrant requirement is subject to only a few exceptions. *Id.* Traditionally, these exceptions have been established by weighing the degree to which the search intrudes upon an individual's privacy against the degree to which the burden of obtaining a warrant is likely to frustrate a legitimate governmental purpose of the search. *Id.* (citing *Riley v. California*, 134 S. Ct. 2473 (2014); *Katz v. United States,* 389 U.S. 347 (1967)).

One exception to the warrant requirement of the Fourth Amendment is the inventory search. A lawful inventory search permits warrantless searches of property lawfully in the government's possession, if the owner's expectation of privacy is

outweighed by the government's interests in (1) protecting the property while it is in police custody, (2) protecting the police against untrue claims of stolen or lost property, and (3) protecting the police from danger. *See Colorado. v. Bertine*, 479 U.S. 367, 369-70 (1987). In other words, the constitutionality of a warrantless inventory search depends on whether the inventory search was reasonable under the totality of the circumstances. *United States v. Taylor*, 636 F.3d 461, 463-64 (8th Cir. 2011).

To be reasonable, the inventory search must not have been "a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). To be reasonable under the Fourth Amendment, an inventory search should be conducted according to standardized police procedures. *Taylor*, 636 F.3d at 464. Failure to do so, however, will not automatically render the search unreasonable. *United States v. Mayfield*, 161 F.3d 1143, 1145 (8th Cir. 1998). The Government bears the burden of showing that its conduct met the inventory search exception. *Taylor*, 636 F.3d at 464.

Officer Duke's conduct at the scene of the stop was consistent with the St. Charles Police Department's policies for towing. The policy provided that "[w]henever a person in charge or in control of a vehicle is arrested, it is the policy of this department to provide reasonable safekeeping by towing the arrestee's vehicle subject to the exceptions described below." (Def. Ex. P-502). These exceptions included when the owner requests that the car be left at the scene or when the vehicle was not used to further the offense for which the occupant was arrested. (*Id.*) However, these exceptions are not mandatory, and the policy only instructs officers in these situations that "consideration should be given to leaving a vehicle at the scene or turning a vehicle over to another in lieu of towing." (*Id.*) The policy further directed that vehicles "shall be towed . . . when the community caretaker doctrine would reasonably suggest that the vehicle should be towed (e.g., traffic hazard, high crime area)." (*Id.*) Nothing in Supreme Court jurisprudence limits police discretion in carrying out inventory searches, "so long as that discretion is exercised according to standardized criteria and on the basis of something other than suspicion of evidence of criminal activity." *Bertine*, 479 U.S. at 375–76.

11

Sgt. Juengst and Officer Duke may have had discretion under the police department policy to leave the Mustang with defendant Gilmore, but they were not required to do so. Towing the vehicle was within the discretional boundaries of the department's policy after its owner had been arrested. Further, "[n]othing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory." *United States v. Arrocha*, 713 F.3d 1159, 1164 (8th Cir. 2013) (citation omitted). The police lawfully exercised their community caretaker function in towing the car, at least in part because it was uninsured and should not be operated in that condition; it had an insecure rear window; it had a damaged cloth roof; and it was in a private gas station parking lot that was open to the public. It was reasonable not to leave the Mustang alone in these circumstances. Accordingly, the decision to tow the vehicle to the police station was a reasonable application of the police department's standardized procedures.

Officer Duke also acted according to the department's standard policy when he conducted the initial inventory of the property in the Mustang at the scene of the stop. Once the vehicle was impounded, the policy instructs that:

> [a]ll property in a stored or impounded vehicle shall be inventoried and listed on the Crime Inquiry and Inspection Report/Authorization to Tow, Form 4569. This includes the trunk and any compartments or containers, even if they are closed and/or locked. Members conducting inventory searches should be as thorough and accurate as practicable in preparing an itemized inventory.

(Def. Ex. P-502 at 3, Saint Charles Police Department Policy Manual, § 502.6.) Although Officer Duke did not list all of the property he found in the car on the form, "established routine" is also a permissible basis to regulate an inventory search. *United States v. Garreau*, 658 F.3d 854, 857–58 (8th Cir. 2011) (citing *Florida v. Wells,* 495 U.S. 1, 4 (1990)). The undersigned has found that it was the routine practice of the St. Charles Police Department to list only items of value over $150 on Inventory Form 4569. And it was also the department's routine practice to photograph the property inside an impounded car, as a better record of what is inside a car than a written list. (Finding No.

12

11 *above.*) On these facts, the initial inventory search at the scene of the stop was conducted according to policy and therefore met the inventory search exception.

Defendant argues that the search of the Mustang at the police station violated the Fourth Amendment, because the police failed to follow the prescribed department policy for inventory searches when the officers made photographs of the items seen in the vehicle instead of recording their descriptions on Form 4569.

The nature of the search conduct at the police station differed from that at the scene of the stop; the search at the police station was much more invasive and thorough. The court's conclusion that the initial decision to impound the Mustang was a valid exercise of the police department policy, does not save the search conduct at the police station from further consideration of whether that conduct was a valid inventory search. *Taylor*, 636 F.3d at 465-66 (citing *United States v. Marshall*, 986 F.2d 1171, 1174 (8th Cir. 1993).

The Supreme Court disqualifies searches as reasonable inventory searches, if they are made for the sole purpose of investigation. *Bertine*, 479 U.S. at 373. In this case, the search at the police station used a method different from that prescribed by the written departmental inventory policies. However, the unwritten departmental routine practice of photographing items in lieu of describing them in writing is a reasonable deviation from the written policy, because of the large number of items in the vehicle. Nevertheless, the officers failed to photograph all of the items of value in the vehicle. They took a single photo of all of the items in the trunk, which contained a number of suitcases and what appears to be a large tool case, with no photos of the interiors of these containers or even the exterior of each individual container. (Def. Exs. S-1 to S-13).

Failure to comply with departmental policy or routine practice does not automatically render an inventory search unreasonable, without "something else" that suggests the inventory search was simply an investigatory search. *See, e.g., Taylor*, 636 F.3d at 465 (where officer testified that basis for towing and search was officer's belief that arrestee had narcotics in his vehicle); *Rowland*, 341 F.3d at 780 (where officer called

for drug-sniffing dog and asked repeatedly if there was contraband in the vehicle). An inventory search that is a pretext for an investigatory search is unreasonable. *Taylor*, 636 F.3d at 465.

Here, a number of facts suggest that the purpose of the inventory search at the police station was criminal investigation. It was only after contraband was found that the decision was made to continue the inventorying of the Mustang at the station for a more complete, thorough, photographed inventory. Nevertheless, an otherwise valid inventory search is not rendered constitutionally unreasonable by the presence of an investigative motive. *See, e.g., United States v. Garner*, 181 F.3d 988 (8th Cir. 1998).

Some circumstances indicate an investigatory purpose in the police station search. The halt of the search at the scene of the stop and the movement of the vehicle to the police station coincided with the discovery of contraband items. The tow form prepared during the first inventory search at the scene of the stop lists items of monetary value – a cell phone, a tablet, and a purse. The photographs taken at the station depict multiple, close-up views of evidentiary items, such as the interior of containers containing contraband. No photos were taken of the interior of the apparently valuable tool case or suitcases. The methamphetamine at issue was found during the second search in the center console of the vehicle, the same general area the officer had already searched when he found the contraband at the gas station. The inventory exception does not justify a second look at already-inventoried locations in order to further investigate for evidentiary purposes. *See, e.g., United States v. Khoury*, 901 F.2d 948, 957-60 (11th Cir. 1990) (holding that an officer exceeded the scope of a permissible inventory search when he re-examined a notebook that had already been leafed through and identified).

Even if the government has not satisfied its burden to establish that the search at the police station meets the inventory search exception to the Fourth Amendment warrant requirement, the motion to suppress should still be denied.

### The Warrantless Search at the Police Station Was Nevertheless Lawful

The government also argues the officers had probable cause to perform the second warrantless search at the police station, and the undersigned agrees.

The initial inventory search at the gas station uncovered plastic bags, a pipe, and a digital scale, which would cause a reasonable person to believe there was a fair probability that more contraband would be found in the vehicle. "'When police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody.'" *United States v. Wells*, 347 F.3d 280, 287–88 (8th Cir. 2003) (quoting *Michigan v. Thomas,* 458 U.S. 259, 261 (1982) (per curiam) (holding that police officers were justified in conducting an inventory search of a car's glove compartment, which discovery gave the officers probable cause to believe there was contraband elsewhere in the vehicle and to conduct a second warrantless search of the car in police custody).

The search of the Mustang vehicle at the police station was constitutional as a warrantless search supported by probable cause. The motion to suppress the evidence seized from it should be denied.

### The Length of Detention Was Reasonable

Defendant Gilmore argues that the length of his pre-arrest detention was unreasonable, because it was longer than reasonably required to issue a warning ticket. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Officer Duke stopped the Mustang at approximately 11:40 a.m. and detained defendant until his arrest approximately twenty to thirty minutes later. There is no *per se* time limit on traffic stops; instead, whether a traffic stop is reasonable in length is a fact-intensive question. *United States v. Olivera-Mendez*, 484 F.3d 505, 509-10 (8th Cir. 2007). The Supreme Court has held that authority for a traffic stop ends "when tasks tied to the traffic infraction are – or

reasonably should have been – completed." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015).

Officer Duke initially stopped Ms. Ellis to issue a speeding ticket, but it became apparent as he was performing this task that Ellis was also driving without insurance, a misdemeanor for which he lawfully arrested her. The officer was authorized to briefly detain defendant Gilmore by asking him to step out of the vehicle until the tasks tied to Ellis' arrest were complete, that is, through the inventory search of her vehicle. *See, e.g., Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997) (holding that a police officer making a traffic stop may order passengers to get out of the car pending completion of the stop). While Officer Duke performed this inventory search, he found contraband, giving rise to a reasonable, articulable suspicion of criminal activity sufficient to detain and investigate Gilmore. *See United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005). Given these circumstances, twenty to thirty minutes was not an unreasonable length of time for defendant to be detained before his arrest.

Defendant's Statements Should Not be Suppressed

Defendant argues his statements to the police should be suppressed as fruit of the poisonous tree, i.e. of the illegal stop and vehicle search. (ECF No. 116). Because the court has not found that defendant suffered a violation of his constitutional rights, there is no poisonous tree of which his statements could be the fruit. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

Furthermore, the record is clear that defendant's pre-arrest and custodial statements were voluntary, because none of them was the result of police coercion or intimidation. *Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986). The statements he made after his arrest followed his being advised of his constitutional rights to remain silent and to counsel, as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). Finally, the record is clear that he knowingly and expressly waived his rights to remain silent and

to counsel, because he was motivated by a desire for leniency if he cooperated with the police. *North Carolina v. Butler*, 441 U.S. 369, 373, 375-76 (1979).

Defendant Gilmore's statements should not be suppressed.

For these reasons,

**IT IS HEREBY ORDERED** that the motion of the United States for a determination by the court of the admissibility of arguably suppressible evidence (ECF No. 100) is denied as moot.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Aaron Gilmore to suppress evidence and statements (ECF Nos. 99 oral, 107) be denied.

The parties have until November 8, 2016, to file written objections to this Order and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

            /S/ David D. Noce_____
           **UNITED STATES MAGISTRATE JUDGE**

Signed on October 21, 2016.